2012, 50, 40. Ms. Hagley, when you are ready. Good morning, may it please the court, I'd like two minutes for rebuttal, please. Conrad's LILO is in all relevant respects structured exactly like the LILOs and SILOs that have been rejected by every other court that has considered them. And the reason why the courts have rejected this transaction is because the transaction is structured so that taxpayers' investment is immunized from any risk related to the value of the property. You think that Judge Horne erred when she talked about certainty, correct? She didn't have the benefit of our later Wells Fargo opinion. She did not have the benefit of that decision, that's correct. She wrote hers up before our Wells Fargo case came out. That's correct. And you believe that the Wells Fargo case clearly says certainty is not the standard, it's reasonable investor prudent, reasonable prudent. Exactly, relying on prior case law that in substance of reform and economic substance cases, what the courts are looking for are the economic realities of what the taxpayer expected, how the transaction was designed going into the transaction. So you believe she applied the wrong legal test, no fault of hers, we hadn't had our opinion not issued yet, but that under our binding precedent we have to recognize that. Why wouldn't that necessitate us vacating and remanding then for her, Mrs. Zane, there's a lot going on in this case, why wouldn't it necessitate us vacating and remanding and telling her okay, you applied the wrong legal test, why don't you reevaluate this under the correct legal test? For two reasons, Your Honor. Number one, looking at the correct statement, which is kind of reasonably expected going into the transaction, the evidence is overwhelming that it expected the purchase option to be exercised. It's blind to plot. We have to find based on the record that she'd be clearly erroneous to conclude to the contrary. Yes, and I think that your court could based on the evidence that we've cited in our brief, but more importantly, even if the purchase option was not expected to be exercised, this recognizes Con Ed's investment from any residual value risk and all the other Lilo-Silo cases have recognized, including this court in the Wells Fargo case, stated at the beginning of the decision when it was analyzing how Lilo's and Silo's operated, stated on page 1322 that, quote, the end of lease options in Lilo are structured to effectively eliminate risk of loss to the taxpayer. The future value of a Lilo-Silo property... How much does the by exercising, for example, the retention option? That's correct. I'm not, on your alternative argument, I'm not so sure that there's any case that has bought that. It may be considered in some of the cases to be a relevant consideration, but I don't think that the protection from loss theory, which you articulate as your alternative theory, has really been accepted yet by any court. It certainly wasn't adopted by Wells Fargo, right? It was accepted by the Court of Federal Claims in Wells Fargo, and in addition... That's all very interesting, but it wasn't accepted by us, right? Well, you recognize that there was that alternative holding that you decided the case on the narrow grounds that the purchase option... Right, but we haven't addressed your alternative theory, and so far as I can tell, no other Court of Appeals has decided that in your favor, or against you, either. Well, the Fourth Circuit did in BB&T, and this Court in Wells Fargo cited BB&T when it made the statement that it's the end of lease options in a Lilo to eliminate risk for the taxpayer, because in BB&T, what the District Court and the Fourth Circuit in that decision held was, you know, if the purchase option gets exercised, then the taxpayer recoups its investment, but even if the purchase option does not get exercised, the taxpayer has the ability to impose the renewal option, and through the renewal option and the pre-set rents, the renewal options are secured by the defeasance account, recoup its investment. That was the holding in BB&T, and that was taxpayers' understanding when it chose to engage in Lilo in this case. We have cited numerous internal evaluations that the taxpayer created before it decided to engage in this transaction, but one that was particularly critical was the leasing white paper that the Court of Federal Claims in this case on page 12 recognized that the Board relied on when it decided to authorize the Lilo, but on page 17122 of the record, that leasing white paper states, and I think it's worth a short quote, that the Lilo quote will be structured in such a way that Con Ed will obtain the same yields and rates of returns regardless of whether the utility exercises its purchase option at the end of year 20 or is required to release the plant for additional 17 years, and the white paper recognizes that the renewal rents are pre-set and then are secured by the defeasance account. Okay, let's back up a moment to the purchase option. If I understand correctly, this was a December 1998 transaction and that... 1997. Pardon me? December 1997. 1997, that at that point there had been quite a few of these Lilo transactions, right? And indeed that Deloitte had given opinions on hundreds of them, right? That's correct. Does the record show whether in any one of these transactions there have ever been a No, not that I'm aware of. Not that I'm aware of. You know, the purchase option date in these cases are in the future. Here it's 2018, you know, other cases it's after that date. Actually, no, I take that back. In Wells Fargo, I believe in the Belgicom transaction, which was one of the five silos that was analyzed in that case, the purchase option exercise had been exercised. But again, it's not just the purchase option. That's not what protects the taxpayer. It's the combination of the purchase option and the subways renewal option. The taxpayer in every... We don't need to go that far, right? Because if the, as Judge Moore is suggesting, if we conclude from the record that it establishes under a clearly erroneous review standard that the purchase option was likely to be exercised, that's the end of the matter under Wells Fargo, right? That is correct. But I'm just stating that the structure of the transaction, the fact that there is the combination of the purchase option and the subways renewal option, that's what provides protection to the taxpayer. Now, what Con Ed and the Court of Federal Claims relied on in looking at the subways renewal option was the fact that there would be the short-tail period after the subways renewal option. But that is true in every silo under the service contract option or under the subways renewal option, there is a short-tail period. And the short-tail period is irrelevant because the investment is recouped before the taxpayer even gets to the short-tail period. The taxpayer does not have to rely on the short-tail period to recoup its investment. And according to Con Ed's internal analysis in this case, during the short-tail period, Con Ed had three choices. He could either lease the facility and acquire additional revenues on top of the investments already recouped and the profits that it's already made, or he could just put the facility into storage. Or finally, he could cancel the head lease and just put the facility back to EZH. Unless the Court has any further questions. We can save the rest of your time, Ms. Hagley. Mr. Abbott. Argument time doesn't have to be proportional to the decision, number of pages of the decision. Good morning, Your Honor. This is David Abbott for Con Ed, the appellee in this case. You seem to read Wells Fargo differently than I do. You don't seem to think that it established a reasonable expectation test and projected a certainty test, right? Well, I think that Wells Fargo upheld a lower court decision with the previous options versus But it talks about what the test is. I mean, I'm having trouble seeing Wells Fargo as not establishing a reasonable expectation test. Well, the Court in Wells Fargo, this Court in Wells Fargo, articulated a number of possible Well, on page 1326 to 137, the Court said, We have never held that the likelihood of a particular outcome in a business transaction must be absolutely certain before determining whether the transaction constitutes an abusive tax system. The appropriate inquiry is, that's pretty key language for a court, the appropriate inquiry is, here comes my test, whether a prudent investor in the taxpayer's position would have reasonably expected that outcome. How is that not a reasonable expectation test? I mean, the Court couldn't have made it any clearer if they had bolded it, highlighted it, and put stars all over the opinion. The Court also used language elsewhere in the opinion that highly probable, highly likely, and it was a number of, if there is a standard being articulated there, it was a number of standards. I think we need to back up the analysis of the purchase option and ask, why is this analysis important at all? Well, let's for the moment assume that reasonable expectation is the test established by Wells Fargo. You seem to go on and argue that the Court of Federal Claims applied that test, and I have read that opinion quite carefully. I don't think that that's correct. Could you show me where the Court of Federal Claims applies the reasonably likely test as opposed to the certainty test? Well, I think it's defined in the findings of judges. Well, I understand, but where? Which finding? Because when you cite that, you cite pages not where the Court of Federal Claims says that it's reasonably likely. You find simply a situation where the Court of Federal Claims prescribes somebody's testimony as saying that. I don't see where the Court of Federal Claims has made the finding that you say the Court of Federal Claims made, and I'm asking you, please show me where in the findings she made that finding as opposed to summarizing somebody's testimony. Well, first of all, with regard to summarizing that testimony, she found that testimony to be credible. She's found that in several places of the opinion. So she didn't actually make the finding that it was reasonably likely. She did not use those words, Your Honor. On page 110 of her opinion, she says, Considering the ROCA3 transaction as a whole, including the terms of the transaction documents and the facts surrounding circumstances testified to at trial, at the time of the transaction, there was no certainty that the sublease purchase option would be exercised. I feel like she applied the certainty test. She bought your certainty test, hook, line, and sinker, and that's what she applied. This is in one of the final paragraphs of the whole section after it goes through all the testimony, and so I guess I'm stuck with the proposition that she applied the wrong legal test. Well, Your Honor, first of all, it wasn't our legal test that she bought, quote, unquote, hook, line, and sinker. All right. She was told that the test by appellant was nearly certain, and the situations in her opinion where she uses the word certainty are all references to the appellant and our appellee's use of the term certainty. But she also says on page 55 of her opinion, Key to the understanding is whether the option necessarily will be exercised. Page 91, court concludes that the sublease purchase is not certain to be exercised. That's the test she applied. Yes. Not reasonable expectation. Yes, Your Honor. Those were her words. She also found- We're sort of stuck with her words, aren't we, rather than what you wish she'd said. Well, Your Honor, I think we're also stuck with her findings, which is that the purchase option was not incentivized to the lessee. The lessee had no incentive to exercise it. The lessee had no fear. I don't recall that she made a finding that there was no incentive to exercise it. Where did she make that finding? It's in our citations in our brief, I think. Well, you're not able to show me where? No. Well, if you're not able to do it right away, I don't want to take up your time doing it. But in terms of Judge Moore's question as to whether we have to remand here, what struck me is that the Deloitte report says there was no economic compulsion to exercise the option, and they rely on the fact that the cost of exercising the option was less than the fair market value of the property. But the problem is there are a lot of other considerations, economic and otherwise, which would have to be taken into account by EZH in deciding whether to exercise the option. And if I understand the Deloitte testimony, and if you look at page 3768 of the record, if you look at the Deloitte testimony, it seems to me pretty clear that Deloitte has said that it didn't take account of those other considerations in reaching its conclusion. And tell me if I'm misreading the testimony. Do you have the record there? I do, Your Honor. But the record also contains expert opinions from others other than Deloitte, which cover those other circumstances. Well, let's stick for the moment with Deloitte. Am I correct that Deloitte did not consider these other economic and non-economic issues in reaching its conclusion about the purchase option exercise? It did not consider non-economic considerations, Your Honor. It did not consider non-economic considerations. That's correct. It did consider all the economic considerations they thought relevant. And my understanding is that the guy from Deloitte was asked, did you consider in drafting your report the consequences to EZH of not exercising the purchase option? And he says that subject was not something that we were asked to provide an opinion on. So that wasn't considered, right? By Deloitte. It was considered by other experts in the record. Which other experts? Well, for instance, Mr. Goulding testified as an expert on regulatory matters in the Netherlands, testified that there would be no need for the EZH in this case. But what page are we talking about? Mr. Goulding's testimony? Yeah. You'd find it in Judge Horne's opinion at A86 that there would be no regulatory compulsion. Also on that page that EZH could source power from other alternatives from this facility and did not need this facility in order to attain the power it needed. Well, I don't quite understand why that doesn't leave room for there being a reasonable expectation of exercising the option. Well, I was trying to address, Your Honor, your questions about other non-economic type, other factors that could be addressed. You also have all the experts that testified that the option would be entirely speculative. It was certainly far beyond. What about, do you have your appendix handy? Yes. Page 25779. You have questions that were sent from Con Ed to its auditors about this transaction, 25779. We expect to get there. Thank you. Also look at 776 while you're about it. That's what I was going to send it back to. Those are the answers. They put the answers before the questions. So let's start with the questions. So start with the question, 25779, question number five. Are you going to take the position that exercise of purchase option is reasonably assured? And then when you go backwards to page 25776, that's where you have the answers to these questions. This is all Con Ed. Question number five. Yes. Among the reasons are facility is newly built. Key assets, utility, subway fee has pre-planned for purchase. Yes. These documents were subject to testimony in the case. The case was five weeks. It was described as, well, this was meant to suggest that the purchase option was more likely than not to be exercised in the subjective view of one of the executives at Con Ed. Well, if that was Con Ed's view, why isn't that dispositive? Well, it was their view at the time that this was written. I think these are advice or communications to Con Ed's outside accountants regarding preliminary statements regarding how the treatment of transactions should be accounted for. It's important to note that Con Ed, in its final accounting for the transaction, booked the transaction on the assumption that the purchase option would not be exercised. That was the final accounting citations that are in our brief. Isn't there another document, 16-032, which I think comes from Con Ed? The structure, transaction structure description indicates it's reasonable to assume that sublease plus E will exercise the purchase option. That's the way it was structured. Isn't that Con Ed's intention? Sorry, 16-032? 16-032.  In other words, aren't there facts which justify a conclusion that with the proper test, you lose? Well, Your Honor, what you've seen here are simply small pieces of an entire record Judge Horn had in front of her. And the entire record is well set out in her opinion that ECH had no incentive. ECH is the party that's going to exercise this option. Had no incentive, but she didn't make that finding. Sorry? She didn't make that finding. That ECH would be the party's? Had no incentive. I believe she did, Your Honor. Well, you're going to have to show me because I have not found that. I find her saying that it wasn't certain, but I don't find her saying that there was no incentive. But I may be wrong. I think she credited the testimony and found no fault with the testimony and cited and even quoted the testimony of government experts that the option would be purely speculative. Government experts said it would be an economic decision to be based upon the values at the time compared to the option price, which is exactly what Deloitte and Mr. Kelly, who testified as an expert at trial, said. The testimony of Mr. Thomas, which is government's expert, was entirely discredited at trial and found to be so by Judge Horn on the purchase option issue. ECH itself said that they know of no factor which creates material indiscipline to exercise. That's the LSC, the party who would be exercising the option. Mr. Golian, as I said, said there would be no regulatory compulsion. And Mr. Reed, who testified on behalf of Kelly, said it would be entirely speculative. Those were findings, Your Honor. They were quoted in the court's opinion on which he relied. A careful analysis, both by Deloitte and by Mr. Kelly, was conducted as to the economic decision to be made at the time the purchase option would be exercised. But Deloitte said that there were all sorts of considerations here which it didn't consider as part of it. So I find it difficult to read Deloitte as reaching a conclusion on the relevant issue. Well, Mr. Kelly did address all the issues he thought would be important, and he thought it was an economic decision. I don't see the Kelly testimony as having addressed these other issues. I mean, there tends to be a simplistic view that the value of the property, as opposed to the cost of exercising the option, that the cost of exercising the option price would be higher. But it doesn't consider all the other ramifications of not exercising the option, both economic and non-economic. I don't see that in the Kelly testimony. And you've agreed it's not in the Deloitte testimony. Yes, Your Honor. Well, I think, again, as I tried before, if we may step back and ask ourselves, why are we addressing the purchase option here at all? The question here, as laid down by the Supreme Court in Frank Klein, is whether or not Con Ed has retained genuine attributes of traditional lessor status. One of those attributes has always been traditional abuse as well as a residual stake in the asset. A purchase option can negate that under some circumstances. If it is so likely to be exercised at a fixed price, there really is no residual stake remaining. I think what this Court needs to address is, is there a formulaic prescription for how likely the purchase option should be exercised? Or is it simply a question of fact, which was found below, that this purchase option is not so likely to be exercised, so as to deprive Con Ed of its residual stake in the asset? That finding, I believe, is found by Judge Horne below. The traditional attributes of traditional lessor status are present here. They were found. Purchase option does not negate that. She credited the testimony that it was speculative, that it was not incentivized to be exercised, that there were no regulatory or market or logistical reasons why ECH would have an incentive to exercise this purchase option. That wholly distinguishes this case from Wells Fargo, from BB&T, all the other cases where the findings there were virtually certain to be exercised. This is at the far end of that spectrum. I know I'm about out of time. The Court has not addressed the questions of defendant's alternative theories on risk of loss. I'd be glad to make a few comments about that. Well, I think your time has expired, Mr. Abbott. All right. Well, thank you very much, Your Honor. You will hear a rebuttal from Ms. Haggard. I actually just have two quick points I wanted to make. First of all, kind of reliance on the Frank Lyon decision is misplaced, and it's misplaced for the reasons this Court pointed out in Wells Fargo, which is that in Frank Lyon, the taxpayer did not have the service contract option, where here it would be the sublease renewal option to immunize their investment from risk to property. It's not just the purchase option, as I said before. It's a combination of purchase option and the sublease renewal option. Two, which goes to the Deloitte report, Con Ed did not rely on the Deloitte report when it had its correspondence with the independent auditor, which the Court was discussing before with Con Ed. Con Ed noted that it had received the Deloitte report's preliminary conclusions, but nevertheless was of the view that the purchase option was reasonably assured to be exercised. What Con Ed relied on was Cornerstone's explanation as to why that would be the case, which takes into account economic and non-economic factors. This is page 16029 of the record. Okay, if the Court has any further questions. Thank you, Ms. Haggard. We'll take the case for review.